Number 141331 Fleming v. Escort, Mr. Dowler. Good morning. May it please the Court. My name is Mike Dowler and I represent the appellant Hoyt Fleming. In this case, the jury invalidated five of Mr. Fleming's patent claims. The subject of this appeal is Mr. Fleming's claim that the District Court erred, both as a matter of law and on the sufficiency of the evidence, when upholding the invalidation of those five claims. Mr. Fleming raises three separate grounds for reversal. And I say it like that because if the Court were to reverse on any one of those grounds, it does not have to decide the remaining two of Mr. Fleming's appeals. From a high level, the issues are these. First, whether the District Court erred in holding that there need not be corroborated prior art evidence of each element of each invalidated patent claim. Second, whether the District Court erred in holding the testimony that fails to identify the claim elements, provide a construction for those elements, or read the construed claims on the prior art suffices to invalidate those claims. And third, whether the District Court erred in holding that an invention that was kept secret for three years due to a corporate bankruptcy is exempt from the abandonment suppression requirement of Section 102G. So I'll take each of those issues in order, the first being the corroboration requirement. With respect to that issue, the District Court acknowledged that there was no corroborating evidence for each claim limitation, but it upheld the jury verdict anyway on the basis that not every claim element required corroborated prior art evidence. Specifically, the District Court ruled as follows, and I quote, Fleming argues that the corroboration evidence must corroborate every element of every claim that S. Court seeks to invalidate. Yet Fleming cites no case so hold it. Fleming's promotion of a rigid standard does not align with the rule of reason and ignores KSR's holding that obviousness is to be judged by an expansive and flexible standard. Ultimately, the corroboration requirement is intended to determine credibility and such evidence could establish the credibility of the purported inventor without establishing every element of every claim. That is the case here. That, from Mr. Fleming's perspective, is the error of law, since this Court's precedent clearly requires corroboration for each claim element. But importantly, if we require corroboration for each claim element, doesn't the inventor testimony then just become surplus? We wouldn't need to get, nobody would need to look at the inventor testimony if there was already other evidence supporting each and every claim element. Going back to the Supreme Court's barbed wire case. Well, I'm just, isn't that true though? If we accept your position that there has to be something besides inventor testimony to support each and every claim element, then that would be enough to support a finding of obviousness, right? Well, in this case, it's anticipation. It's a prior invention. It's just my question. If there's evidence besides the testimony on each and every claim element, then the testimony becomes superfluous, right? I believe that's true. So your legal position would then render inventor testimony not useful in any circumstance. I don't think it's, it's not that it's not useful. It's the law of this Court and the Supreme Court has held is that inventor testimony alone is not enough to invalidate a claim when the claim is prior invention by that institution. So why would anybody ever offer inventor testimony if you already have some evidence on each and every claim element? Well, I don't think that they could. They could offer a prior reference through an expert witness. Well, that's what troubles me. It seems like the logic of your legal position is that inventor testimony is never relevant, and that's certainly not our case law. Correct, although that is not our position. Our position is that when an inventor comes in and testifies that I made the invention before the inventor did, his testimony must be corroborated because he's an interested witness, and the case law is such that if that were the only evidence, then that would not be enough to invalidate the claim at issue because he's an interested witness and the law requires that his testimony be corroborated. Now, your point is, is what if the inventor didn't testify and we just had a prior art reference? That, I agree, would be enough to invalidate the claim if the claim element's read on that prior art reference because there's no issue about that. What troubles me is the logic of your legal position renders inventor testimony essentially not credible for any purpose, and that doesn't seem to be our case law. And I agree. I'm not suggesting that it's not credible for any reason. I'm suggesting that the law requires that the inventor testimony be corroborated. It can't stand on its own. I'm not saying it's not relevant or not worth anything. Why isn't the rule really that what has to happen is when an inventor comes in and testifies about his invention, there has to be enough corroborating testimony to render it credible? Not that there has to be evidence on each and every specific claim, but just to show that his testimony about whether he actually did, in fact, invent the device or not is credible. That has not been the Court's precedent. What precedent do you think is the strongest on your side? You cite six cases. We do. Which of those cases do you think is the strongest for you in articulating a rule that every limitation in every claim that's under attack has to be corroborated by independent documentary evidence? There was a case just last year, Taurus IP 726 F3rd 1306, that clearly indicates that each claim element must be corroborated. Can I just ask about this? Of course. It seems to me there is something to be said for the proposition, and maybe even if it was agreed, that if you think about the elements one by one and ask was there specific corroboration that identified that specific element, that maybe there wasn't. But why isn't each element, as you described, basically in three categories, corroborated by documents showing Mr. Orr was working on radar detectors. He was interested in GPS. GPS tells you about location. He was interested in location and, therefore, about distance. Why does that not tend to corroborate these elements in substance, even if there isn't a very specific mapping? Why are you going to integrate a GPS into a radar detector unless you want to tell the radar detector something about where you are in relation to something else in terms of distance, presumably to prevent reasonably corroborated,  Why doesn't that effectively provide corroboration? I think the documents and the evidence that were supplied at the trial court and to the jury do corroborate that Mr. Orr was working on certain things. What they don't corroborate is that he made the invention. In other words, they don't corroborate that he had a radar detector and that he put the GPS in the radar detector. There are documents that say he was working on radar detectors. We don't dispute that. There are documents that say... Well, maybe then the problem or the issue is what exactly corroboration means. It doesn't mean directly demonstrate, but rather provide a non-manipulable source of evidence that tends to suggest. And so if it means something softer like that, why don't the documents that show he's working on radar detectors, he's looking at GPS in conjunction with his work on radar detectors. GPS gives you location and therefore distance information. Is there some other theory about what he might have been doing other than trying to build a distance measurement into the radar detection? Absolutely, Your Honor. What is that? Well, you can do all kinds of things with a GPS that have nothing to do with determining a distance between two points and comparing it to a stored distance in order to lock out a false signal. I mean, you could have a GPS. I've got a GPS in my cell phone. You can use a GPS for all kinds of things unrelated to Mr. Fleming's invention. So the mere fact that... What things would you use them for if you're looking at the GPS specifically to figure out how to use it with a radar detector? For example, I mean, there are radar detectors on the market that don't do that but have a GPS in it. For example, you might have a dual-purpose GPS radar detector where the GPS just tells you where you are, gives you a map, tells you how to get somewhere. Oh, that's just sort of taping them together. I'm sorry? Just taping them together. Yes, well, integrating their functionality but not to do false location lockouts. Let me ask you a question if I could. A question about one specific pair of documents that were in the list of documents that were purported to be corroborating. The documents are two emails that were discussed in the course of testimony at 7354 and 7353 of the joint appendix. One is from Greg Orr and the other is a response... I'm sorry, Steve Orr and the other is a response to Mr. Orr in which relate by context and by testimony to a brainstorming session that was held back in 96, I think it is. And one of the comments made in the second email is that could we... This is discussing Mr. Orr's idea. Could we patent the concept of vehicle speeds, not engine speed, muting and vehicle position muting? And this is in the context of a discussion of the role of the GPS in the radar detection and referring to muting. Isn't that sufficient to establish that Mr. Orr was thinking about the muting function in connection with location determination in a radar detection system? I think the issue of whether or not false signal alerts in radar detectors was recognized for a long time. A lot of people probably worked on that and thought about ways to try to resolve it. Whether or not any of those people ever put a radar detector together with a GPS and determined the distance between the two locations and determined a lockout distance and compared those to an order as one method of rejecting the false alarm was never done in the prior art. And in those emails, that level of detail was not discussed. I think it is true that Mr. Orr was working on radar detectors. It is true that he was considering using a GPS unit, but there is no evidence that he combined those two. There is no evidence that he generated a distance between, stored a position of a false alarm, used the GPS in the radar detector to determine a distance between that stored location and where he's at, and then used the distance between those to another stored lockout distance to reject the false alarm. Let me ask you one other question, just a factual question that was not clear to me from the record. There were some references to the software that Mr. Orr had created, and this was one in the series of iterations of that software, TST4600K. I saw, I think, that Mr. Kuhn testified that he got that in the form of something that had been left over on the bankrupt company's disks and may have had the diskette. Was that in evidence, that software? Yes, sir, it was. It was. And what does that software show? This is not I, which was referred to. There was a series 4500I, which was introduced, and we have it in the appendix, I think, but this is 4500K, which was the last iteration, I think, of Mr. Orr, if I understand it correctly. Yes. Was K in the record? No, it wasn't. I'm told it was not. Okay. I believe that software that Mr. Orr testified that he created, but he lost and was not ever able to find it. Okay. Before you run completely out of time, can I just ask you one other question? What's the priority date for the Fleming invention? Is it the date of the filing in 1999, or is it earlier than that? Well, for purposes of the case, it's the filing date, 1999. His conception date was, by his testimony, as I understand it, in 1998, correct? That's correct. May 20th, 1998, something like that? That sounds familiar. In the case, though, we didn't rely on an earlier conception and diligence to get his invention date earlier because we didn't need to. Well, I'm a little confused by that. I mean, are you saying that you're waiving any argument to that May 98 date? And let me say, I'm going to lay my cards on the table. I'm not going to try to trap you here. That seems to me very important for your abandonment issue, that May 98 date. There was testimony at trial that that's when Mr. Fleming made his invention. He conceived it, and then he worked from that date to file a patent application. It just doesn't seem to me like there was any sufficient factual finding on that, that you relied on the 99 date. Well, because— Let me just put all the cards on the table. On the abandonment issue, it seems like you may have some argument there, but not, to me, the way you've actually presented it. It does seem to me that the 12 or 13 months that Mr. Orr wasn't working on that might be termed an abandonment, but then he restarted working on that sometime in July through September of 98. So that seems to me that that would get rid of an abandonment problem if your priority date is 99, but not if your priority date is the May 98 date. Does that make any sense to you? It does. At trial, the evidence was introduced that Mr. Fleming made the conception in 98, and that he worked on it and filed an application in 99. There was no testimony that after the conception, he, in some sense, reduced it to practice before the application date. No. So we have a constructive reduction to practice. It would be a constructive reduction to practice, correct. That was the evidence at trial. The issue never came up as to whether or not that particular date mattered because S-Corp was claiming at trial that it reduced to practice in 96. So our argument is that there's no evidence that he reduced to practice in 96, and after 96, when they went bankrupt for three years, he didn't do anything. And so where Mr. Fleming's invention came in doesn't seem to matter for purposes of suppression and concealment because he did nothing. He kept the invention secret for three years, did nothing. Why? Because the company was bankrupt. So the thing is, if we disagree with you about that, and I think there's differing views in the record about that, the May 98 date seems important because it does seem at least undebatable that he, well, I wouldn't say undebatable, but there's significant evidence that at least for about a 13-month period, he didn't do anything, but that he did restart working on it after he came back to work for S-Corp. And so it seems to me that he could have abandoned it and then restarted it, and he may not get the priority date all the way back, but he could get that restart date as a priority date. And that seems to be smack in the middle of the May 98 date when you're talking about conception and the 99 date when you filed the patent. Yeah, on the abandonment suppression, I don't think the issue is, is Mr. Orr entitled to an invention date when he started to rework on his invention. Let me just ask this plainly. If we think that his really early date is not supportable because he did abandon it, but he restarted working on it sometime between July and September of 98, and we're going to give him that date, what does that do to your case? I mean, because if we assume that that's his invention date sometime in 98, if we take the patent date, your patent date, as the effective date of your patent, then it's still a prior art. Well, I don't think so, Your Honor, because, I mean, there's no evidence whatsoever in the record of even if you decide that he started reworking on the invention sometime in 98. July 98. There's no evidence in the record of any kind of diligence whatsoever that he diligently worked on it between that date and when he filed the patent application. But you didn't litigate a question, did you, about that would fall under the particular diligence rules about conception, later reduction in invention. That was not, there was evidence about that, but that was not an issue that was ever decided by the jury. So you're not relying on that May 98 date? You're just relying on the April 99 date? Well, no, I mean, you know, if the issue is important, of course we're relying on the 98 date. But that was not an issue that was put to the jury. I'll say that. There was evidence at the trial that that was the case. There was evidence that Mr. Fleming conceived it in May of 98. There was evidence that he worked on it continuously up until he filed the patent application. The evidence was that Mr. Orr… What are we, I'm sorry, I'm taking you way over your time, but what are we supposed to do with it if we don't agree with your view of abandonment and we don't agree with Escort's view of abandonment? And it seems to me that there's not any evidence or factual findings that we can look at, even though we may have de novo review on the issue of law on this question. Well, I think you have to decide it based on the evidence that was advanced at trial and is part of the record in this case. And I believe that evidence shows that Mr. Orr abandoned it for at least three years. Okay. If I could ask just one more question, I'm sorry. I'm struggling to understand what the effect of the bankruptcy of the company is. I mean, you say that there's a gap of, let's say, a year. There's a period after the bankruptcy in which Mr. Orr continued, as I understand it from the testimony, to work with Mr. Kuhn to try to give him information about the projects he was working on, including this project. But clearly the bankruptcy was a major disruption. Mr. Kuhn had to come in and sort out what was left of Cincinnati Microwave. Is it your view that the fact of the bankruptcy should not matter to the lack of activity during that year-long period? It's Mr. Fleming's view that that is not an excuse for abandonment suppression. Suppose instead of a bankruptcy, let's suppose that there was a lab in which somebody was working and they'd gone very far down the road. Indeed, they even had an early reduction to practice of the invention and they were heading towards applying for a patent and the lab burned down. And reassembling all the materials, getting the experiments going again, and so forth, took a year. That surely wouldn't count as abandonment suppression or concealment, would it? It may, in fact. The inventor always has the option of disclosing... You think that that would be abandonment? If the inventor is saying, I want to get that lab built back as fast as I can, I want to get us back on our feet, we've lost a year because of the fire. That would be abandonment? A strange concept of abandonment, it strikes me. Agreed. And I don't think it would necessarily be considered abandonment in that context, but certainly suppression. The policy of the U.S. patent laws encourages inventors to come forward and disclose their inventions to the public. And whether or not their factory burned down or not, agreed, if he had every intent to continue to develop and he wants to get that factory rebuilt as fast as he can, in his mind and maybe everyone's reasonable mind, that particular circumstance is not abandonment, but it seems to be a suppression, at least from the eyes of the public, which patent laws encourage inventors to disclose their inventions. Surely the standard of abandonment suppression and concealment requires something more than simply not acting as soon as you possibly can. Indeed, something substantially more than what we have held to constitute insufficient diligence. The district court held, and I'm not sure that I disagree, that if an inventor is refining his invention and if the factory burnt down and he got it built as soon as he could and he continued to work on his invention in order to get it in a position where he could make a product or eventually file a patent application, I think that may be fine. Those aren't the circumstances here. The basic circumstance, if I understand it right, is Cincinnati Microwave goes bankrupt. He works with the committee to look for purchasers of the asset. The assets include, that is the assets of CMI, not him personally, include this intellectual property. They find a buyer. The buyer now needs to set some priorities about getting some revenue. First works on getting a particular product out, and then in pretty short order, basically within a year, brings Mr. Orr back, not as an employee but as a consultant, to now refocus on this project. Is that the basic scenario here? Well, you have some of the facts right. The one fact I think that may be critical here is that the asset buying company, which became Escort, was in the process of trying to collect the assets and sort them out and figure out what it wanted to do. In the meantime, Mr. Orr went to go work on cell phones. Right, but the asset didn't belong to him. It did not belong to him. So the shift in the responsibility and opportunity together for doing something with this intellectual property moved from CMI to Escort. He couldn't all by himself go and do this. Agreed. So Mr. Orr was off working on cell phones, and it sat dormant. For some other companies, is that right? Yes. And the invention or the technology sat dormant in Escort's files for three years. No, not three years. No. The only dormancy, if I understand the record, is the period after Mr. Orr left. I know you say, well, he should have filed a patent application as soon as he reduced the practice, but his testimony is he continued working on this project throughout the period between 1996 and February of 1997 when the bankruptcy occurred. That's not the evidence. The evidence is he says he reduced it to practice in 1996, and then he wanted, in order to refine his invention, he needed a new computer, he needed some help with it, but the company at that time was in financial dire straits. It had not declared bankruptcy yet. He asked for a computer for the new company so he could work on his invention. They said, no, we don't have the money for you to get a new computer. He lost his source code. Things went down, and then some number of months later, during which he did nothing on the invention, they declared bankruptcy. So it was in 1996 that he stopped. The bankruptcy occurred in 1997. The new company didn't get going again until 1999. The first product the new company came out with didn't have anything to do with GPS. Their first priority was just to get a product on the market which had nothing to do with GPS. It wasn't until later that they told Orr, hey, that GPS stuff you were working on, let's see if we can't get that going again. Okay, well, maybe we should hear from the other side. We will restore your rebuttal time. Thank you very much. And I think you have about 12 extra minutes. Thank you, Gerald. I'm Greg Ahrens, and I represent Escort. We have both response to the appeal. We have a cross-appeal on the invalid reissue topic, which I'd like to address as part of my opening remarks. But I would like to respond to some of the comments that were made in the questions of Mr. Dower, particularly about the corroboration requirement. And in particular, corroboration boils down to the matter of credibility of a witness. And in this case, Mr. Orr testified for many hours on the stand. And so not only did the jury hear his testimony, but the judge, who later was ruling on the JMOL, also saw his testimony. Well, maybe he was an extremely effective liar. Do you know of a case where we have said, and suppose there is a smidgen of corroboration of one truly tiny piece that we can say that that's enough because the jury thought that for eight hours he was personally very, very credible? Or does corroboration have to extend to some pretty substantial amount of the scope of the substance of the testimony? Well, that's an excellent question. And I think in this case it's more along the lines of the latter scenario in any event. But the rule of reason, which is the applicable standard in the corroboration rubric, the rule of reason analysis essentially is kind of a sliding scale, if you will. If a witness is not coming across as credible or is somehow just very acceptable. Have we said that? I'm curious. The rule of reason? I know that we've said that corroboration is a rule of reason, but have we spoken about the amount of corroboration that's required being a function of how otherwise personally credible in demeanor and so on the witness is? I'm not aware that the court has specifically done that sort of a balance. And if you have, or if the court has, and I'm not aware of it, I apologize. But I'm not aware of some particular formula of that kind. The less credible, the more corroboration or something like that. But I think the rule of reason would just, by its nature, because it gets at the credibility of the witness, a jury who found by clear and convincing evidence that Mr. Orr did what he testified to. So that's a high threshold. The jury was instructed properly on the law of anticipation and obviousness. There was no objection to those instructions. There was no objection to the corroboration requirement and the prior invention instruction. So the jury had the law and they had the witnesses. And it wasn't just Mr. Orr. He was corroborated through certain documentary evidence. But to get back to your exact question, I do think that, and would tend to agree that you, a party, would need to put in more circumstantial corroborating evidence to bolster a witness who's maybe not as particularly credible. I would agree with that. But I think that's exactly what happened here. Let's be mindful of what the actual claims are that were invalidated. Claim 18 and Claim 45 of the 038 patent. I mean, we're talking about this complicated technology, a GPS and a radar detector and there's all kinds of algorithms and source code and all these other things. But these claims really boil down to either three elements in Claim 18 or two elements in Claim 45. And one's a microprocessor. So nobody here in this case, Mr. Orr or Mr. Fleming, invented microprocessors. There's no dispute about that. A circuit coupled to the microprocessor for detecting incoming police radar signals. So that's now just a radar detector so far. And then the third element is a GPS receiver that's coupled to that microprocessor and is operable to provide the microprocessor with data that indicates the position. So element C is a GPS unit. So essentially Claim 18 is just taking a GPS and having its data fed to a radar detector through a circuit so that you know where this radar detector is when it receives a radar signal. And Mr. Orr testified to that, so he did. And, in fact, the email that one of y'all asked about, which is 7354, talks about utilizing a GPS and a radar detector. And other documentary evidence shows that, indeed, Mr. Orr drove around in his car and the data points even show that his home address was very credible, that it was viable, credible evidence. And he drove around and he was noting his location through a GPS. And he testified that that was connected to a laptop, which is certainly a circuit and a microprocessor. And he works for a radar detector company and he says he has a radar detector associated with it. And the evidence shows... By the way, was CMI doing anything other than radar detectors or was that the full scope of its business? They were predominantly a radar detector company. They may have had some other products, but they were predominant. And they, in fact, were one of the early developers of the Passport and Escort radar detectors back in the 80s or early 90s when they became fairly commonplace until they got outlawed in places like Virginia, et cetera. So, in any event, the corroboration issue does not turn on whether every element of a claim is corroborated by separate testimony. I think the court asked Mr. Dowler about that. The cases he cited, the Torres case, certainly does not say that every element of a claim needs to be corroborated separate and apart from what the inventor's testimony is. Because, as Judge Hughes pointed out in his question, there would be the point of having the inventor's testimony at all other than to perhaps authenticate the documents if they were his own. Well, it might also be to connect a number of things that essentially centralize the invention in the way necessary for 102G. But it might truly just be authentication and narrative and not essentially the addition of substance. And I'm not aware, I agree, and I'm not aware that the precedent of this court goes to that. I'm just not aware that that's the issue. Do you think the Lazar case is the strongest case for you on the rule of reason not every limitation need be corroborated principle that you advocate? I think so. I mean, this is kind of our lead cited case in response to the ones that Mr. Dower cited. So I believe at this point it is. I'm not aware of something that I would rank higher. Could I ask you just factually the same question I asked your opposing counsel? Do we know what happened to the TST 4600K software? The TST 4600K, I believe, is the version of software that was not in evidence because it was not, it didn't exist. But it existed at some point, I take it. It's just it was lost, is that correct? Correct. And that was the final, that was what Mr. Orr was using at the end of his project as of the time of the bankruptcy? Correct. So just to be very specific about this, Mr. Orr, and certainly in 1996, because you can tell the company ultimately in 1997 did go through the bankruptcy, times were tight. You don't just all of a sudden hit a brick wall and you go bankrupt. Maybe you do, but generally there's a downslide. So he actually borrowed a computer and he testified to it. He borrowed a computer for somebody in a different department and he used that computer. And this is during late 1996? In 96. In 96. I believe it led up to the reduction to packets in April, May of 96 because this is the software that has the, you know, you hit the space bar and it locks out. That's the missing portion of the code. That's the one section that is not in the record. It was testified to, but having the actual code didn't occur at trial because he returned the laptop and the code was on that laptop. And he asked, as Mr. Dollar pointed out, if he could get a new laptop. The company continued to slide. He couldn't get a new laptop. And then he, at the time of trial, we couldn't get the code back. Now, I will say that leading up to trial, he rewrote that code to use as an example, but the court excluded that because it wasn't the actual code. So it was a matter of, I think, 46 lines of code or something to that extent. But truly, yes, it was not in evidence. If I might address the topic of Mr. Fleming and his May of 98 date, there was testimony about the issue of May of 1998 and his invention disclosure. So it is in the actual record. I'm not sure it's in the appendix materials. Okay, great. But it certainly wasn't briefed at this court. But I think if the record is reviewed, it will show that, because I frankly asked the questions myself of Mr. Fleming, show me where in this invention disclosure document from 1998 you have these things that were ultimately the claims. In other words, where are the claims that are at issue supported or do they find support in your invention disclosure if you're trying to go all the way back to there? Couldn't do it. And I think this court wouldn't be able to do it if it looks and does that same analysis. So there was no reliance on the May of 1998 date by Mr. Fleming at trial along the lines of the questions that you've all asked. It just didn't play out that way. The jury instruction on prior invention does talk about both inventors. It talks about them sort of equally, that each one must demonstrate if and when he conceived and or reduced to practice and was there some diligent period. So that's in there. And it wasn't just one-sided jury instruction slanted towards Mr. Orr having to show that. It was also put in that Mr. Fleming would have to make that same showing. But there was never – there was not a specific jury verdict interrogatory asking the jury to find whether Mr. Fleming had demonstrated some conception in May and reduction to practice through the filing of his patent application in, excuse me, April of the following year. But it was subsumed, I believe, in the jury interrogatory that asked them whether Mr. Orr abandoned, suppressed, or concealed. Because that was necessarily, I think, wrapped up in the jury finding that he did not do that. Or if he did along the lines of what Your Honor asked Mr. Orr, that effort, that potential abandonment was resurrected in June or July of 1998 and then he proceeded to file his patent application, Mr. Orr, that is, in 1999. So I believe that's – September of 1999, was that when the application was filed? Mr. Orr's was filed in June of 1999. June 14th. Oh, June 14th. And Mr. Fleming's was in April of that same year. Right. So it was a two-month gap, right? It was almost exactly a two-month gap. So I don't believe – I believe that that underlying issue you all asked about is wrapped up and subsumed into what the jury actually found, but I can't point to a factual finding by the jury on that specific issue. And when they moved for JMOL, did they make an argument based on a priority date of May of 1998 for Mr. Fleming? No. I don't recall what you said about my time, but may I turn to the cross-appeal? Yes. You still have 10 minutes. Okay. May I turn to the cross-appeal on the – Your time. Okay. I would like to address it because I think it is an important issue for this court. In fact, this exact panel decided in Ray Dinsmore about five months ago. And this is an issue that is reviewed to no vote, the issue of whether the patent claims in the two reissued patents in suit are valid or invalid reissues. And although the briefing may lead you to believe that there is a dispute because the question of whether a reissue is valid or invalid is a question of law, and it is reviewed to no vote by this court. There isn't actually a dispute, I don't believe, or a challenge about any of the underlying facts. I think it's very clear what happened. Mr. Fleming testified that he wrote his claims in his patent application like a program. He said that at least once, several times perhaps, in the briefs. I'm having a little trouble understanding what the significance of that is. I mean, for purposes of error, something happens in the market, which is, I think, not uncommon. And as a patentee, you realize it suddenly strikes you, boy, that's my invention. And then you go back to your patent and you say, oh, my goodness, I didn't actually claim it. And if you're within two years, you get to go back and in your declaration say, I was mistaken in my understanding of what my claims covered or something quite like that. Why is this any different from that in a way that, I guess, full stop, why is that not standard garden variety error? Well, first of all, it is certainly commonplace for patent applicants to amend claims, file continuation applications, and I'm talking about original prosecution now, to survey the market and adapt and modify their claims. In fact, the Kingstown case- Brad, have we spoken one way or the other about exactly what Kingstown said in the continuation or amendment context? Have we spoken about that in the reissue context? Not that we have found. So we're trying to address this by some form of analogy to other scenarios and some of the principles that are put forth in the other reissue cases that find either not invalid or invalid reissue. But I believe it was a fundamental mistake by the district court to actually rely on Kingstown for this proposition that it's okay for a reissue applicant to file for claims to cover commercial products. Kingstown has nothing to do with a reissue patent. First of all, it's a seminal inequitable conduct case, but in any event, the patents ensued were regular patents as opposed to reissue patents. So there's a distinction. If you're standing there as the applicant before the patent office and you will file a continuation in a regular patent application and you want to modify your claims to cover commercial products, you don't have to take a position that, oh, I made a mistake, I made an error. You don't have to do anything like that. The reissue statute as a panacea or corrective measure for patents is much more limited in scope. If everybody could walk into the patent office... But it still covers situations where you drafted your claims too narrowly or too broadly, doesn't it? It does, but the... So if he drafted his claims too narrowly and when he looks back a year and a half later and decides, my specification supports a much broader claim, my invention is a much broader claim, why isn't that precisely the situation where he can go back and seek a reissue patent with the broader claims? I believe, Your Honor, that the Hewlett-Packard case makes it clear and, in fact, the statute itself talks about there has to be an error and the error has to be connected to either the inoperativeness or the invalidity of claims, either too narrow or too broad. Those are two distinct concepts. You don't satisfy Section 251 with one thing. Hewlett-Packard... Too narrow. What does too narrow mean if it doesn't mean too narrow to be effective with respect to some goods that are out there on the market? A patent isn't invalid for being too narrow. So what does too narrow mean if it doesn't mean a case such as this? Well, it certainly could mean that it's too narrow in the sense that you put in limitations that you, let's say, didn't need to put in because of the scope of the prior art because there's a possibility that somebody could infringe that. But to have the... What's the difference between that? That sounds like this case. But the precipitating factor is seeing the product and thinking to yourself, oh, I wrote these claims as a program. What is the error that's established here? The error is... And here this is also a bit of a unique situation relative to any of the reissue cases because Mr. Fleming is both the inventor and the patent attorney. So this is not like, you know, In re Weiler where, gee, the patent attorney didn't understand the scope of the invention and, gee, the inventor didn't understand claiming practice and so there was some miscommunication which was the error or mistake that was... Why does that really matter? I mean, are you suggesting we should hold him to a different standard under the statutes than we would hold other people? No, but what I think you should do is hold him to the same standard. In re Weiler did not condone an argument that, gee, I'm the inventor, I don't understand claiming practice or, gee, I'm the patent attorney, I didn't understand the scope of the invention. Those are the kinds of cases that actually find no error for invalid reissue or no error for reissue purposes. So I think Mr. Fleming should be held to the exact standard. And if he is... I don't know the facts of that case, but is your argument that if an inventor discovers within a two-year period that he'd claim less than he could have, that that's not an error? Well, there has to be something in addition to that. And I think that's what the Hewlett-Packard case says. The Hewlett-Packard case says... What in addition does there have to be? Well, I'll just cite you to the HP case. And, Your Honor, it says that there has to be, for statutorily required error, has two parts. Error in the patent, i.e. it's either too broad or too narrow, and then error in the conduct. So, sure, I find out, learn that my claims are too broad or too narrow. I still have to satisfy the second prong under the HP analysis that there was some error in my conduct. And all we have here is... Why is it that you fail to apprehend the breadth of your invention and error in your conduct? Well, that would be one thing. But here, that's not what happened. He testified that he made a conscious decision. He's a patent attorney. So he mistakenly, perhaps, put on his I'm a programmer hat and wrote his claims like a programmer would. Mistakenly is the key word, isn't it? Pardon me? Mistakenly, the word you used, seems to me that's the error. Well, I used the word mistakenly, but what was it really? It was a conscious choice. I mean, he's a licensed patent attorney, and he obviously chose how he wrote his claims. But it wasn't a conscious choice to avoid prior art or anything like that, was it? No, no. The claims were not written in a conscious way to avoid prior art. Originally, they were not. They were, as he testified, written as a programmer would write them. That seems to suggest that any time somebody chooses to write something, that that's a conscious choice. If that's what you're saying, then I don't see how claiming less than what your invention has would ever constitute an error under your analysis. Of course people, when they write them, are making a conscious choice about the language they use, but they could still misapprehend what their invention was and not intend to limit it that way. I understand that. Is there any indication that he actually intended to limit his actual invention to his claim language? I mean, it seems that this as-a-programmer stuff doesn't do a whole lot. Well, I guess the additional fact may be that he testified that at the time that he filed his original patent claims or the claims that issued as the underlying patent, he did not intend to claim that which he claimed later in the reissue. I mean, he specifically said that he didn't intend to claim it that way or claim those things. Now, it's not a recapture problem like some of the other reissue cases because they weren't presented and removed, and I realize I'm really going late here. Why don't you reserve what we will now call two minutes for rebuttals. Thank you all very much. Thank you. I'm going to spend 60 seconds on the corroboration issue. I think what you've heard today, and you'll see from the briefs, there's one document that Mr. Orr and Escort could have produced at the trial that would have proven that he made Mr. Fleming's invention, and that was that TST 4600K that Judge Bryson mentioned. That document is missing. Mr. Orr said he had it, but he said now it turns out that he supposedly lost it. All that we're left with are various scraps of paper and other things that we specifically asked Mr. Orr and Escort's expert at trial, do these additional documents outside of the software, the TST software, show any of these claim elements that Mr. Orr supposedly invented. The testimony was no, they don't. So the one document that would corroborate his testimony is gone. So all we're left with is Mr. Orr's oral testimony, yes, in fact, I had the software and I did it. And I think this court's precedent is clear that that is not enough to establish a prior invention under 102G. On to the reissue issue. The first thing I think that we should address is whether or not this is an issue that we should be considering at all. The first ten claims in Mr. Fleming's first reissue pattern the result of their success on this argument would be to invalidate a whole lot of claims that currently stand as valid claims, right? That's correct. Why doesn't that end the question of whether there's jurisdiction to consider their contention? Because in the Serrano case, the court held that whether or not there's error on some issue like that, and it wasn't a reissue claim, but whether or not there is an error like that, if the liability judgment can be affirmed on some other ground, then that error is harmless and need not be addressed on appeal, right? So in the first ten claims, which are original, which aren't reissue claims, the Hewlett-Packard case says that even if you find these other reissue claims, claims 11 through 30, invalid because there wasn't an error in this case, that qualifies them to be reissued, those ten claims will stand no matter what your finding is on the other claims. Within those ten claims, the jury found that every one of the accused products infringed, and I'm going to use claim 7 because it's just the easiest, there's no contention about that, infringed claim 7. So all products infringe one claim, there wasn't any testimony or evidence or anything else about whether or not the damages should be different depending on which claim was infringed. They would come away, would they not, with a stronger judgment if claim 7 was invalidated. In particular, they wouldn't have to worry about doing something, continuing to practice it or doing other things that might come within it that weren't at issue here. Traditionally, an invalidity judgment has been, I think, quite consistently treated as a stronger judgment than a non-infringement judgment. Well, in this case, there's no chance of claim 7 being invalidated. Claim 7 is an original claim that's not subject to their reissue appeal. So claim 7 is going to stand no matter what happens today. And all the products were found to infringe claim 7. Now, there are some cases out there that say, well, if some claims are invalidated and others aren't, and the trial was such that some claims applied to some products and other claims applied to other products, and the money judgment didn't differentiate between those two, then if you find some claims invalid, you're going to have to remand it to figure out what part of the judgment corresponds to the claims that are still valid. If that's not our situation, they'll concede that. Here, claim 7 is not going to be touched on appeal, and every product that was accused was found to infringe that claim. And there's no precedent, or the precedent is that it doesn't matter how many claims were infringed. The number of claims infringed does not affect the amount of damages award. One claim infringed is enough to warrant a full damages verdict. On the merits of the cross-appeal, I take it that you agree with your opposing counsel that there is no decision in this court that's really on point here with respect to the question of whether a failure to cover as much of the subject matter as could have been covered, which comes up in light of seeing a new product on the market that could have been covered by the patent if it had been claimed correctly, whether that is a permissible error under reissue. No case says that, right? I haven't seen it in the reissue context. It came down in the continuing prosecution, but that's quite a different box, or at least arguably a different box from the reissue box, right? I don't think so. You think conceptually it's the same thing. I understand your argument. I think conceptually it's the exact same thing. I think Section 251 says it's the exact same thing. Let me ask it more directly to get at the argument your opposing counsel is making, that simply saying an expression of regret about not having drafted the claim more broadly at the time it was initially drafted is not a mistake. Its regret is different from mistake, and why isn't this a regret case as opposed to a mistake case? Well, I don't know. I don't really understand the regret aspect of it. Well, you would be much happier if you had originally claimed the way you claimed in the reissue. You wouldn't have this issue. So to that extent, you regret not having claimed it. I think that's true. I think every time you make a mistake you have some regret, though, right? Well, but not every regret is the product of a mistake. That may be true, too. In terms of precedent, though, there is a case, and we cited it in our brief, and I apologize for not having it at my fingertips here. There's a district court case out of New Jersey. Yeah, Ursula Mittal from Judge Robinson. Then she says, of course you can do this in a reissue. Although in that case the reissue time had expired, but she was saying that in dictum at least. Okay. And then I'll say, Mr. Ahrens keeps referring to the Hewlett-Packard case, and I caution the court to be careful about that case because it's an old case that was talking about an old version of 37 CFR 1.75, which corresponds to, talks about, and fleshes out Section 251. And the actual holding in that case is there was a failure to comply with a component of that portion of the CFR that doesn't exist today or when Mr. Fleming was operating under the reissue procedures in that case. So I caution the court to be careful in terms of the reliance that Mr. Ahrens is placing on it because it just simply doesn't exist now or when Mr. Fleming was applying for his reissue. The last point I'll make... What was the case that you were referring to there? The Hewlett-Packard case. The Hewlett-Packard case, right. All right. The last point I'll make, and I think it's a good one, and it's surprising when I saw it in their briefing. What S Court's argument on reissue boils down to, and this is what they say in their brief. They say, Fleming admitted lack of intent during prosecution of his original patent to draft claims that were ultimately submitted in the reissue patents is relevant and determinative because it demonstrates he never made an error correctable through reissue. But in the C.R. Barr case, this court held that that exact argument... It rejected that exact argument. It says, M3 system states that since the needles were not claimed originally, they were not intended to be claimed, and that absence of such intent is not an error correctable by reissue. That, too, is an incorrect statement of the law.  The only way he knew how, because of his background as a programmer, that he didn't intend to ultimately cover a product that he found out or avoid prior art that he later found out about, is not the law. That, the absence or presence of intent, is not the determining factor for whether or not an error was made. Thank you. Thank you very much. Mr. Arons, you have a couple of minutes for... Thank you very much. First of all, the issue of whether the reissue issue should be hear and heard, I think, is clear. I mean, if one of the two patents in suit upon which the vert was rendered is invalidated, not only is the public served by that, but also in this particular case, as we ask for a remand for a remitter on that basis. So I think there is value and certainly jurisdiction for this court to do it. What would be the possible theory of a remitter? Well, the... Other than the fact that the jury might have been whipped into a frenzy by having additional claims before it. The trial evidence relating to the jury verdict was essentially that Mr. Fleming was attempting to sell his patent portfolio for a certain sum of money. And rather than awarding an ongoing royalty at a number of dollars per unit, the jury specifically said and wrote onto the verdict form, lump sum $750,000 for these two patents. Our theory for the lower court would be essentially, look, one of the two patents that is subject of this lump sum award is out, if that's what this court were to decide it's not valid. That won't support the verdict of $750,000. It should be essentially cut in half. That would be our theory. So I believe that... Or you could have a new trial indemnity, which you might not want. No, and we didn't ask for a new trial indemnity. I'm not surprised. Right. Thank you. So the other point, I believe that the lack of an intent to claim a particular subject matter that is then later claimed shows that there's a lack of a mistake. You didn't intend to do something, but you did somehow... Let me wrap up now. Thank you. Okay, thank you. Appreciate it. And we'll switch tables for the next argument. Stay put. Okay. That case is submitted and now we will move on to 1414, Escort against Fleming. No, no. Oh, yeah.